**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

***

THE UNITED STATES OF AMERICA,

Plaintiff,

vs.

WARREN PIZARD SMITH,

Defendant.

Case No. 2:16–cr–341–APG–VCF

**REPORT & RECOMMENDATION**

Before the court are Smith's motion to suppress (ECF No. 18), the Government's response (ECF No.20), and Smith's reply (ECF No. 26). The court also considered the Government's supplement (ECF No. 32), Smith's response (ECF No. 35), and the Government's reply (ECF No. 36). For the reasons stated below, Smith's motion is granted.

## I. Background

On November 8, 2016 at approximately 3:30 a.m., Las Vegas Metropolitan Police (Metro) Officer Kim responded to a domestic violence call at 7709 Himalayas Ave. (ECF No. 18-1) A neighbor had witnessed a man beating a woman with his hands and called 911. (*Id.*) Officer Kim met with the victim, Dawn Davis, at a nearby gas station. Davis told Officer Kim her boyfriend, Defendant Warren Smith, had beat her with his hands. (ECF No. 27[1]) Davis was upset that Smith had not returned home with their one-year old son, K.S., until 3:00 a.m. that morning. (*Id.*) Smith beat Davis and took K.S. into their shared apartment. (*Id.*)

[1] Docket number 27 is a CD, which contains video clips from Officer Kim's body camera. An article of clothing obscured the camera lens. While there is no video of the encounter, there is clear audio record of Officer Kim's statements. It also appears that one or more clips may be missing as there is no record of Davis's mother's arrival on scene.

Davis told Officer Kim that there was a handgun in the apartment, but Smith did not usually carry the gun on his person. (*Id.*) She also confirmed that Smith did not have a history of violence towards her or their child. (*Id.*) After interviewing Davis, Officer Kim informed her that "in the state of Nevada, domestic battery is a mandatory arrest. Okay. So at this point, if we run into him, he is going to be arrested for domestic battery." The officer reassured Davis that law enforcement's goal was not to remove K.S. from her custody. (*Id.*) Davis declined to write a voluntary statement and did not want to be photographed. (*Id.*)

Later on, Davis's mother arrived. Officer Kim told the pair that officer would attempt to perform a welfare check on K.S., but warned them that "if [Smith] doesn't answer [the door], it's not like we can bust in the door." (*Id.*) The officer continued, "if he doesn't let us [check on the child], there's not much we can do."

As Officer Kim walked up the stairs to the apartment, she saw an individual on the second-floor landing. (*Id.*) Officer Kim described the individual as standing "bladed" when she first approached him. A "bladed" position is where the individual has his back facing the officer, but whose upper torso is turned so that he is looking at the officer. The individual acknowledged that he was Warren Smith. (*Id.*) Smith was holding a bag of clothes in one hand. K.S. was standing near him. (*Id.*)

At Officer Kim's direction, Smith placed the bag of clothes on the ground. Smith answered several questions about his relationship with Davis before Officer Kim ordered Smith to: 1) remove his hand from his pocket; 2) turn around; and 3) submit to a patdown search. (*Id.*) The patdown search revealed a handgun in Smith's pocket. (Id.) Officer Kim placed Smith in handcuffs and read him his *Miranda* rights. (*Id.*) Smith claimed that the handgun belonged to Davis and that he had been planning to steal it. (ECF No. 18-1).

On November 22, 2016, Smith was indicted on one count of being a felon in possession of a firearm. (ECF No. 1) Smith now moves to suppress the handgun and his statements as fruits of an unlawful search. (ECF No. 18)

## II. Discussion

Smith's motion to suppress presents three issues: 1) whether Officer Kim was permitted to approach the landing in front of Smith's apartment; 2) whether Officer Kim had a reasonable suspicion that Smith was armed and dangerous; and 3) if the court finds Officer Kim's conduct was unconstitutional, whether the handgun and statements are admissible under the inevitable discovery doctrine.

1. The Landing in Front of Smith's Apartment Was Within the Apartment's Curtilage

The curtilage is entitled to the same Fourth Amendment protections as the home. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The Supreme Court has described the curtilage as "the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *Id.* Courts consider four, non-exhaustive factors to determine whether a particular area is within the curtilage: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 307, 107 S.Ct. 1134, L.Ed.2d 326 (1987).

Officer Kim encountered Smith in front of the apartment he shared with the victim. Smith contends that this area is within the apartment's curtilage and attaches photographs to support his argument. (ECF No. 26-3) This court agrees that the landing is part of the apartment's curtilage.

The landing easily satisfies the proximity factor. The area is located at the top of a flight of stairs immediately adjacent to the front door. (*Id.*) The landing is akin to the front porch of a house, an area that has long been recognized as part of a house's curtilage. *Florida v. Jardines*, 133 S.Ct. 1409, 1415, 185 L.Ed.2d 495 (2013).

The landing also satisfies the enclosure factor. The landing is enclosed by a half wall. The staircase is also bracketed by the same half wall. These walls create a clear pathway from the sidewalk to the front door of Smith's apartment.

The nature of use factor is neutral. Smith stored a mop and bucket and placed a welcome mat near his front door. Apart from these items, the landing is barren.

The design of the staircase and landing help prevent unwanted observation. From ground level, it would be difficult to observe individuals on the landing. The lower half of the body would be obscured by a half wall. The landing is also on the second story of a building with no similarly elevated area adjacent to it. Although the area was not completely shielded from outside observation, the half wall and elevation gave the landing sufficient protection from observation to satisfy the last factor.

The Government does not contest the physical characteristics of the staircase or the landing. (ECF No. 32) It also does not argue the applicability of the four curtilage factors on the staircase and landing. (*Id.*) Instead, the Government contends that even assuming, without conceding, that the landing is part of the apartment's curtilage, *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), permitted Officer Kim to make a warrantless arrest at the landing.

In *Santana*, police officers arrested the defendant in the doorway of her home. *Id.* at 40. An arresting officer testified that the defendant "was standing directly in the doorway one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." *Id.* at 40 n. 1. The Supreme Court held that officers did not need a warrant or exigent circumstances to

arrest the defendant because she was standing in a public place at the time of arrest. *Id.* at 42. While in her doorway, the defendant, "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.*

The Government's argument ignores several Supreme Court cases decided after *Santana*. In *Oliver v. United States*, the Court reiterated that "court have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). *In California v. Ciraolo*, the Court again revisited the curtilage doctrine. 476 U.S. 207, 212-13, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Id.* The *Ciraolo* court concluded that yard adjacent to a home was within the home's curtilage. *Id.* at 213.

Recently, the late Justice Scalia succinctly summarized the extent of the curtilage. *Jardines*, 133 S.Ct. at 1415. "[T]here is no doubt that the officer entered [the curtilage]: The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id.*

The Government's *Santana*-based argument does not consider the subsequent evolution of the Supreme Court's curtilage doctrine. Therefore, based on an analysis of the four curtilage factors articulated in *Dunn*, the court concludes that the landing in front of the apartment was within the apartment's curtilage. 480 U.S. at 307.

/// /// ///

/// /// ///

/// /// ///

2. Officer Kim Performed an Unconstitutional "Knock and Talk"

The "knock and talk" exception to the warrant requirement allows "law enforcement officers [to] encroach upon the curtilage of a home for the purpose of asking questions of the occupant." *United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012).

The "knock and talk" exception is limited in scope. "[T]he government must demonstrate that the officers conformed to 'the habits of the country,' by doing no more than any private citizen might do.'" *United States v. Lundin*, 817 F.3d 1151, 1159 (9th Cir. 2016)(internal citations omitted).

These limitations include approaching only during normal waking hours, unless officers have reason to believe that the occupant accepts visitors at odd hours, and limiting the intrusion to the "purpose of asking questions of the occupants." *Id.* at 1160. This means that "[t]he 'knock and talk' exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant." *Id.* Put another way, "[a]n officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door merely to ask the resident questions, even if the officer has probable cause to arrest the resident." *Lundin*, 817 F.3d at 1160.

The Ninth Circuit has extended the curtilage's protections to all non-consensual seizures within the curtilage. Officers may not use the "knock and talk" exception to enter the curtilage and conduct *Terry* stops. *Perea-Rey*, 680 F.3d at 1189 ("An expansion of [the knock and talk] exception to allow for *Terry* stops or searches and seizures within the curtilage is wholly inconsistent with *Oliver* and *Dunn*.")

Smith argues that Officer Kim's contact with him in front of his apartment violated his Fourth Amendment rights. (ECF No. 26) Smith relies on *Lundin* to support his argument. In *Lundin*, law enforcement officers had probable cause to arrest the defendant for numerous violent felonies. 817 F.3d at 1160. Instead of obtaining a warrant, officers conducted a "knock and talk" at the defendant's home

at 4:00 a.m. *Id.* While waiting at the front door, an officer heard a loud noise coming from the backyard. *Id.* The noise caused the officer to rush to the rear of the home and arrest the defendant as he was attempting to flee. *Id.* On appeal, the Ninth Circuit declined to disturb the district court's finding that officers went to the defendant's home for the sole purpose of arresting the defendant when he opened the door. *Id.* This fact combined with the unusual time the "knock and talk" was conducted led the Ninth Circuit to conclude that "officers violated Lundin's Fourth Amendment right to be free from unlawful searches when they stood on his porch and knocked on his front door." *Id.*

Like the *Lundin* officers, Smith alleges that Officer Kim approached his apartment door, she did so with the sole intent of arresting him for domestic battery. On this point, the court disagrees with Smith.

Earlier in the night, Officer Kim had told the victim, "in the state of Nevada, domestic battery is a mandatory arrest. Okay. So at this point, if we run into him, he is going to be arrested for domestic battery." Officer Kim later clarified her remarks, "if [Smith] doesn't answer [the door], it's not like we can bust in the door." The officer continued, "if he doesn't let us [check on the child], there's not much we can do." When Officer Kim approached Smith, she was non-confrontational and asked him if he would be willing to answer questions. At no point, did she raise her voice, draw her weapon, or tell Smith he was not free to leave. Based on these facts, the court finds that Officer Kim approached Smith's apartment with the intent of asking him questions.

Smith also contends that the officer's "knock and talk" was unreasonable because it was done outside of normal waking hours. On this latter point, the court agrees with Smith. Based on the police report, the "knock and talk" occurred sometime between 3:30 a.m. and 5:00 a.m. Officer Kim did not have any reason to believe that Smith would ordinarily accept visitors in the small hours of the morning. It was only by pure coincidence that Officer Kim contacted Smith outside of the apartment. The fact

that Officer Kim was able to contact Smith at such an unusual hour does not alleviate the requirement that "knock and talks" be conducted during normal waking hours. *See Lundin*, 817 F.3d at 1159.

Since a "knock and talk" operates as an exception to the warrant requirement, the Government's failure to establish the exception leaves the court addressing Officer Kim's warrantless entry onto Smith's curtilage. *Perea-Rey*, 680 F.3d at 1186 ("Because Agent Trujillo did not have a warrant, his entry into the [curtilage] was presumptively unreasonable in violation of Perea-Rey's Fourth Amendment rights.") The court concludes that Officer Kim's entry was an unreasonable intrusion on Smith's curtilage and a violation of this Fourth Amendment rights. *Id.*

The Government argues that Smith consented to his initial encounter with Metro officers. (ECF No. 36) "It is well established … that the Fourth Amendment is not implicated when law enforcement officers merely approach an individual in public and ask him if he is willing to answer questions." *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007). "No Fourth Amendment seizure occurs when a law enforcement officer merely identifies himself and poses questions to a person if the person is willing to listen." *Id.* "Moreover, it is clear that the permissible questions may include a request for consent to search, 'as long as the police do not convey a message that compliance with their request is required." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

Even if Smith had consented to a conversation with Officer Kim, that consent was tainted by the officer's prior illegal conduct. "Under the Fourth Amendment … evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding … consent, unless subsequent events have purged the taint." *United States v. Bautista*, 362 F.3d 584, 592 (9th Cir. 2004). "The test for determining whether the primary taint of a prior constitutional violation has been purged is commonly referred to as an 'attenuation analysis' or an 'attenuation test.'" *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004). "To determine whether a prior illegality is sufficiently connected

to the subsequent consent, [courts] look to three factors: (1) the temporal proximity between illegality and consent, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." *Id.* at 1073.

As discussed above, Officer Kim's decision to conduct a "knock and talk" at Smith's apartment in the early hours of the morning was unreasonable. Any subsequent consent was tainted by this initial illegality i.e. the decision to approach Smith's apartment at a time when no reasonable person would expect visitors. Further, the taint was not purged by the time Smith allegedly gave his consent. Within approximately 60 seconds of approaching the staircase, Officer Kim identified Smith, instructed him to put down a bag of clothes, and patted him down for weapons. The close temporal proximity between the approach and the encounter as well as the lack of intervening circumstances, leads the court to conclude that any consent was tainted by the original illegality. *See id.*

As with any other Fourth Amendment violation, the remedy for Officer Kim's warrantless search is the suppression of all subsequently discovered evidence, namely the handgun and any incriminating statements made after the patdown. *Perea-Rey*, 680 F.3d at 1189 ("The district court's denial of Pera-Rey's motion to suppress the fruits of Agent Trujillo's warrantless search was reversible error.")

3. Pat-Down for Weapons was Not Supported by Reasonable Suspicion

"When a suspect voluntarily opens the door of his residence in response to a non-coercive 'knock and talk' request, the police may temporarily seize the suspect outside the home (or at the threshold) provided that they have reasonable suspicion of criminal activity." *United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000)(emphasis in original).

If Officer Kim's "knock and talk" had been conducted in a permissible manner, there was reasonable suspicion to briefly detain Smith. Office Kim knew a witness had reported an African-American male hitting a woman with his hands, a story later confirmed by the victim. From the victim, the officer learned that the suspect was named Warren Smith and he had a small child with him. When Officer Smith encountered an individual with a small child in front of the apartment identified by the victim who answered to the name Warren Smith, she had reasonable suspicion to believe he was her suspect. Whether Officer Kim had reasonable suspicion to conduct a frisk for weapons is a different matter.

"A lawful frisk does not always flow from a justified stop." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). "Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined." *Id.* "If the stop is based on founded suspicion and the officer has reason to believe that the suspect is armed and dangerous, the officer may conduct a limited weapons search." *Id.*

"To establish reasonable suspicion a suspect is armed and dangerous, thereby justifying a frisk, 'the police officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016)(quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "This inquiry requires consideration of all the facts and circumstances an officer confronts in the encounter; [courts] consider the totality of the circumstances." *Id.* "Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334 n. 2, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990).

"In assessing the totality of the circumstances, relevant considerations may include: [1] observing a visible bulge in a person's clothing that could indicate the presence of a weapon; [2] seeing a weapons in an area the suspect controls, such as a car; [3] sudden movements suggesting a potential assault or attempts to reach for an object that was not immediately visible; [4] evasive and deceptive responses to an officer's questions about what an individual was up to; [5] unnatural hand postures that suggest an effort to conceal a firearm; and [6] whether the officer observes anything during an encounter with the suspect that would dispel the officer's suspicions regarding the suspect's potential involvement in a crime or likelihood of being armed." *Dillard*, 818 F.3d at 877.

The Government cites the following facts to support its argument that Officer Kim had reasonably suspected that Smith was armed and dangerous: 1) Smith was suspected of domestic violence; 2) the victim stated that there was a gun in the apartment; and 3) Smith made furtive movements and had his hand in his pocket when Officer Kim approached. (ECF No. 20) In her police report, Officer Kim only stated that Smith "began acting nervously by repeating his questions and fidgeting." If these facts had been the only information available to Officer Kim, the court would agree with the Government's argument. However, Officer Kim also knew information and observed behavior that would have dispelled her suspicions. *Dillard*, 818 F.3d at 877.

First, Officer Kim's testimony about seeing the handle of a gun protruding from Smith's pocket is not credible. At the evidentiary hearing, Officer Kim testified that she could see the black handle of a gun protruding from Smith's pocket. However, in her arrest report, written shortly after the incident, Officer Kim wrote "[t]he handgun was concealed inside his pocket in such a manner as not to be discernible by ordinary observation." (ECF No. 18-1 at 3) This statement directly contradicts her testimony. It is unlikely that Officer Kim, approaching a poorly lit landing in the wee hours of the morning, would have been able to discern a black gun handle allegedly sticking out of Smith's pocket.

Second, the victim had told the officer that it was unlikely Smith would have the gun on his person. This defused any concern of Smith being armed by virtue of a gun being inside the apartment. Third, Smith complied with Officer Kim's instructions. He calmly answered the officer's questions and removed his hand from his pocket at the officer's direction.

Based on these circumstances, Officer Kim did not have facts sufficient to conclude that Smith was armed and dangerous. She encountered a calm, compliant man holding a bag, who she knew was unlikely to be armed. Indeed, Officer Kim acknowledged in her police report she only became aware of the handgun after she began the pat down. (*Id.*) Thus, Officer Kim lacked reasonable suspicion that Smith was armed and dangerous. The patdown violated Smith's right to be free from unlawful searches.

4. The Government Has Not Shown that Metro Officers Would Not Have Inevitably Discovered the Handgun or Smith's statements

The Government argues that Metro officers had probable cause to arrest Smith for domestic battery. The handgun would have therefore been inevitably discovered through a search incident to the arrest. (ECF No. 20)

The doctrine of inevitable discovery permits the admission of evidence that was obtained via unconstitutional police conduct. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989). "The government bears the burden to show, by a preponderance of the evidence, that discovery of the evidence was inevitable." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). "The government can meet its burden by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence." *Ramirez-Sandoval*, 872 F.2d at 1399.

"A search incident to a lawful arrest is an exception to the general rules that warrantless searches violate the Fourth Amendment." *United States v. Camou*, 773 F.3d 932, 937 (9th Cir. 2014). "The first requirement of a search incident to arrest is that the search be limited to the arrestee's person or areas in

the arrestee's immediate control at the time of arrest." *Id.* "The second requirement of a search incident to arrest is that the search be spatially and temporally incident to the arrest." *Id.*

The search incident to arrest exception does not apply when the underlying arrest was unlawful. *United States v. Mota*, 982 F.2d 1384, 1389 (9th Cir. 1993)(holding that a search incident to arrest could not be upheld when the underlying arrest was made in violation of state law).

The Government argues that Metro officers had sufficient probable cause to arrest Smith for domestic battery. (ECF No. 20) The Government however does not explain how Metro officers could have effected a lawful arrest. Officer Kim encountered Smith within the curtilage of his apartment. The location required the Government to prove an exception to the warrant requirement would have justified Smith's warrantless arrest. *United State v, Struckman*, 603 F.3d 731, 747 (2010)("[P]olice officer must either obtain a warrant or consent to enter before arresting a person inside a home or its curtilage or make a reasonable attempt to ascertain that he is actually a trespasser before making the arrest.") The Government's proffered exception to the warrant requirement, "knock and talk," fails due to the abnormal hour of the visit. Without a valid theory for Smith's warrantless arrest, the Government has failed to sustain its burden that the discovery of the handgun and Smith's statements was inevitable.

ACCORDINGLY,

IT IS HEREBY RECOMMENDED that Smith's motion to suppress (ECF No. 18) be GRANTED. The handgun and any statement made after Officer Kim began her patdown search should be suppressed.

IT IS SO RECOMMENDED.

DATED this 2nd day of March, 2017.

CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE