# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00341-APG-VCF |
| Plaintiff, | **ORDER MODIFYING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND GRANTING MOTION TO SUPPRESS** |
| v. | |
| WARREN PIZARD SMITH, | |
| Defendant. | (ECF Nos. 18, 37, 40) |

Defendant Warren Pizard Smith filed a motion to suppress all evidence seized on November 8, 2016. ECF No. 18. After an evidentiary hearing and supplemental briefing, Magistrate Judge Ferenbach entered his Report & Recommendation recommending that the motion to suppress be granted. ECF No. 37. The Government filed an Objection to the Report & Recommendation (ECF No. 38), Smith filed a response (ECF No. 39), and the Government moved for permission to file a reply (ECF No. 40). Pursuant to Local Rule IB 3-2(b), I have conducted a *de novo* review of the motion to suppress and related papers.

Police officers arrested Smith on the porch of his home without a warrant, despite having ample time to obtain one. There were no exigent circumstances justifying this warrantless arrest. The officers had no permission to be on Smith's porch, either express or implied. They nevertheless walked onto his porch to arrest him. "The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," and warrantless entries are thus "too substantial an invasion to allow," "at least in the absence of exigent circumstances." *Payton v. N.Y.*, 445 U.S. 573, 585-89 (1980) (citation omitted). And for purposes of the Fourth Amendment, the home includes the porch where Smith was handcuffed. *Florida v. Jardines*, 133 S.Ct. 1409, 1415 (2013). Because of this violation of Smith's Fourth Amendment protection against a warrantless arrest, I grant the motion to suppress. Because my rationale is similar to, but somewhat

different from, Judge Ferenbach's reasoning, I modify his Report & Recommendation as further explained below. 28 U.S.C. § 636(b)(1); LR IB 3-2(b).

## I.    FACTUAL BACKGROUND

On November 8, 2016 at approximately 3:30 a.m., Las Vegas Metropolitan Police Officer Kim responded to a domestic violence call. Officer Kim met with the victim (Dawn Davis) at a nearby gas station and learned that defendant Warren Smith had beaten Davis when Davis tried to leave with their toddler (K.S.). After the beating, Smith took K.S. into their shared apartment.

Davis told Officer Kim that there was a handgun in the apartment but that Smith did not usually carry the gun. She also confirmed that Smith had not been violent towards her or their child before and that she had no reason to believe Smith would harm K.S. ECF No. 22 (CD of body camera recording, Exhibit 4 to evidentiary hearing, file 12).[1] Officer Kim told Davis that "in the state of Nevada, domestic battery is a mandatory arrest. Okay. So at this point, if we run into him, he is going to be arrested for domestic battery." *Id.* However, she also told Davis that her goal was not to remove K.S. from Davis's custody, and that although they could go by Smith's home, if Smith did not answer, they could not "just go in there." ECF No. 27, Exhibit D (file 11). Officer Kim also interviewed two other witnesses to the beating. ECF No. 38 at 3:13-20.

About one hour later—and without seeking a warrant to arrest Smith—Officer Kim began walking up the stairs to Smith's second-floor apartment when she saw an individual on the porch. ECF No. 33 at 3. She stopped on the stairs, said hello, and asked if he was Warren. ECF No. 22, Exhibit 4, file 9. Smith said that he was. Officer Kim then asked Smith if he had a few minutes so they could talk. Smith responded that he did. Smith was holding a bag of clothes in one hand and K.S. was standing near him. Officer Kim greeted K.S., and Smith asked what Officer Kim wanted to talk about. Officer Kim requested Smith put down the bag of clothes, which he did. Officer Kim then asked a few questions about Smith's relationship with Davis and about whether

---

[1] The body camera was apparently blocked by a part of Officer Kim's clothing. Thus, the video shows nothing usable but the audio recording is preserved.

they had been in an argument. Smith acknowledged Davis was the mother of his child but he denied they were in a romantic relationship. The audio recording reflects that Smith calmly responded to Officer Kim's few questions. ECF No. 22, Exhibit 4, file 9. Within one minute of encountering Smith, Officer Kim asked Smith to remove his hand from his pocket and turn around. She handcuffed Smith and conducted a pat down search during which she found a handgun in Smith's pocket. Officer Kim gave a *Miranda* warning after which Smith claimed that the handgun belonged to Davis and that he had planned to steal it. ECF No. 18-1 at 3. Smith moves to suppress the gun and his statement.

At the evidentiary hearing, Officer Kim and her partner, Officer Saari, testified they could have obtained an arrest warrant and neither gave a reason why they did not do so. Evid. Hrg. at 1:24:30 p.m., 1:55:15 p.m. Officer Kim testified she went to Smith's apartment to arrest him and also to continue her investigation to get Smith's side of the story. *Id.* at 11:45:23 a.m., 11:50:30 a.m. However, Officer Kim also testified that even if she had not conducted the pat down and found the gun, she would have arrested Smith. *Id.* at 12:07:38 p.m. Officer Saari's testimony was unequivocal: he went there to arrest Smith. *Id.* at 1:53:10 p.m.

II.    **ANALYSIS**

It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotations omitted). The Government concedes that the "Fourth Amendment's protection of the home against warrantless searches extends to a home's curtilage." ECF No. 32 at 4:12-13 (citing *United States v. Dunn*, 480 U.S. 294, 300 (1987)); *see also Jardines*, 133 S.Ct. at 1415 ("The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'") (citation omitted). Magistrate Judge Ferenbach found the porch where Smith was arrested to be part of the apartment's curtilage, and the government concedes as much. ECF No. 37 at 5:20-21. I adopt that finding. Because Officer Kim arrested Smith in the curtilage of his home without a warrant, the arrest is presumptively unreasonable unless the

government can show that an exception to the warrant requirement applies. *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012) ("[S]eizures in the curtilage without a warrant are . . . presumptively unreasonable.").

The most common exception to the warrant requirement is an exigent circumstance requiring immediate action. *Brigham City*, 547 U.S. at 403. For example, where officers are pursuing a fleeing criminal, or they have a reasonable belief that a homeowner is destroying evidence, the officers can enter the home or curtilage to make a warrantless arrest. *Id.* But there was no such exigency here. Davis confirmed to Officer Kim that this was the first time Smith had beaten her and, more importantly, that she had no reason to believe Smith would harm K.S. ECF No. 22, Exh. 4, file 12. Over an hour passed between Officer Kim's interview of Davis and the time she approached Smith at his apartment. ECF 33 at 3. There was sufficient time to call for an arrest warrant. The officers did not seek a warrant and no exigent circumstances justified foregoing one.

That leaves three other arguments that the government contends justify this warrantless arrest: (1) Officer Kim was permitted to arrest Smith on his porch because she had permission to be there, (2) in the alternative, the officers needed no permission or exigency to conduct a warrantless arrest because Smith was standing in view of the public (even though he was standing in the curtilage of his home), and (3) the officers would have inevitably discovered the weapon they found on Smith.

### A. Whether the officers had express or implied permission to walk onto Smith's porch

The government first contends no warrant was required because Officer Kim had permission to be on Smith's porch—either implied permission under the so-called knock and talk rule, or express permission from Smith when he agreed to briefly talk to Officer Kim. "An officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, even if the officer has probable cause to arrest the resident." *United States v. Lundin*, 817 F.3d 1151, 1160 (9th Cir.

2016).  This is because officers, like girl scouts selling cookies, generally have an implied license to walk up to a home and attempt to engage the occupant in conversation. *Id.*  Similarly, if the occupant of a home invites officers to enter his home or its curtilage, the officers may do so. *Jardines*, 133 S. Ct. at 1416 (discussing both express and implied consent to enter the curtilage of someone's home).

But when officers forego a warrant and rely on an express or implied license to enter the curtilage of a citizen's home, additional limitations apply.  These limitations exist because the officers' right to be there is defined by what the resident consents to.  The first limitation is that the officers may walk only in areas for which the homeowner has given them express or implied permission to go, and officers may remain there only for a reasonable time. *Jardines*, 133 S. Ct. at 1416.  Thus, under the implied license afforded by the knock and talk rule, officers may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 133 S.Ct. at 1415.  When seeking actual consent to enter someone's home, officers must generally make a "specific request" to enter, and even then, they are permitted to stray only where any other visitor might be expected to go. *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016 (9th Cir. 2008).

The second limitation was clarified recently in a series of search cases.  The Supreme Court held that the "scope" of a "license [to enter the curtilage] . . . is limited not only to a particular area but also to a specific purpose." *Jardines*, 133 S. Ct. at 1416.  In other words, not only must officers stay within certain physical boundaries, but their purpose for entering the curtilage in the first place must be a purpose expected by the occupant—either because of societal norms or given what the occupant did or said to the officer.  The Supreme Court thus held that officers who walked onto a porch to search with a drug-sniffing dog violated the Fourth Amendment because the officers were not invited on the property "to do *that*." *Id.*  It did not matter that a member of the public walking her dog might have an implied license to walk onto that same porch to talk with the occupant.  What mattered was that the officers were walking the

dog to conduct a search, and they had no permission to enter the defendant's curtilage for that purpose. *Id.*[2]

In these cases, the Supreme Court did not precisely explain whether an officer's purely subjective purpose is enough to violate the scope of a license to enter. In holding that the officers in *Jardines* exceeded the scope of their license, the majority relied on the fact that the officers' "behavior *objectively* reveal[ed] a purpose" to do more than talk with the occupant. *Jardines*, 133 S. Ct. at 1417 (emphasis added). This objective behavior outside the scope of the license was the officers' act of bringing a drug-sniffing dog onto the curtilage of the home. *Id.* at 1416-17.

One way to read *Jardines* is that when officers are relying on an implied license to talk with someone, their objective behavior must align with that purpose, but their subjective purpose does not matter. Thus, the officers' expected purpose is relevant to determine the scope of their license to enter, but perhaps whether they violate the scope of that purpose is judged by only their objective acts. This reading would align with the bulk of Fourth Amendment jurisprudence, which centers on an officer's "objective" behavior. *See id.* at 1423-24 (Justice Alito, dissenting). Indeed, Justice Alito appears to read the majority's opinion this way. *Id.* at 1424 (framing the majority's test as one of "objective . . . purpose").

The Ninth Circuit, however, held in *Lundin* that "the actual motivation of the officers matters," and that this analysis turns "on an officer's *subjective* intent." *Lundin*, 817 F.3d at 1160 (emphasis added). *Lundin* is rather similar to this case. In *Lundin*, officers received a radio dispatch calling for a defendant's arrest, and they went to the defendant's home to arrest him. *Id.* at 1155-58. The officers walked onto the front porch and banged on the door, which caused their quarry to flee out a back exit, where he was arrested. *Id.* The defendant contended that the officers violated his Fourth Amendment rights by walking onto his porch and knocking with the intent of arresting him without a warrant. *Id.*

---

[2] Indeed, the dissent in *Jardines* argued that the officers' purpose for entering the curtilage should not matter, and the majority expressly disagreed. *Jardines*, 133 S. Ct. at 1416.

The Ninth Circuit explained that the officers' license to approach the home and knock was "limited to the purpose of asking questions of the occupants," and "[o]fficers who knock on the door of a home for other purposes generally exceed the scope of the customary license." *Id.* at 1159 (quotation omitted). The court found that the officers knocked on Lundin's door for the purpose of arresting him because they were responding to a radio call asking for Lundin's arrest. *Id.* at 1160-61. The court concluded that because the officers walked up and knocked with an improper intent, the officers' subsequent arrest and search of the defendant's home was unconstitutional. *Id. Lundin* leaves little doubt that the Ninth Circuit believes subjective intent matters, and I am thus bound to follow *Lundin's* lead.

The officers here violated both the geographic and purpose limitations for warrantless entries. First, the government has not shown that Officer Kim could reasonably believe she had permission to walk onto Smith's porch in the first place. The implied license of a knock and talk does not apply because Officer Kim talked to Smith before walking onto his porch; she therefore could no longer believe she had an implied license to "approach" his home to "knock on his front door with the intent merely to ask the resident questions." *Lundin*, 817 F.3d at 1160. The knock and talk rule gives officers a limited license to walk onto the curtilage of a home if they need to knock on the door so they can ask to speak with an occupant. Here, Smith was already standing outside so Officer Kim had no need to knock.

Nor has the government shown that Smith otherwise gave Officer Kim express or implied permission to walk onto the porch. Officer Kim never asked if she could walk onto Smith's porch.[3] She was capable of talking with Smith from the stairs given that she had done just that. Smith agreed to talk for a few minutes, but the government points to no evidence suggesting that Officer Kim could not do that from where she was (on the stairs, outside of the curtilage). Given

---

[3] Some cases suggest that when the occupant of a home is present, officers must expressly ask for permission to enter—and this rule would seem to apply when officers seek to enter the curtilage given that it, too, is a constitutionally protected part of the home. *See Lopez-Rodriguez*, 536 F.3d at 1016 (holding that if an officer chooses not to specifically ask for permission, she generally cannot rely on the occupant's "failure to object to" the entry).

the early hour and Smith's demeanor, the government has not shown that it was reasonable to expect that Smith was inviting a conversation with Officer Kim that would require her to walk onto his porch.[4] The government submits no other evidence shedding light onto why Officer Kim believed Smith was giving her permission to enter the curtilage of his home. Because Officer Kim's body camera was covered, there is no direct evidence of their interaction. On this record, the government has not shown that Officer Kim had express or implied permission to walk onto Smith's porch. The government therefore has not rebutted the presumption of unconstitutionality that attaches to the officers' warrantless arrest.

But even if Officer Kim had permission to walk onto Smith's porch to talk, her entry was still unconstitutional because she exceeded the scope of that permission by entering not just to talk, but also with an improper intent to arrest. The government suggests that so long as the officers could walk up on Smith's porch to ask him questions, it makes no matter that the officers also had an ulterior motive to arrest Smith. But under Supreme Court and Ninth Circuit authority, the officers' purpose in entering the curtilage matters. The officers had already determined that Smith must be arrested due to the domestic battery he had committed. ECF No. 22, file 12. They testified that they went to Smith's home to arrest him. And they did arrest him within a minute of encountering him.

Thus, the officers did not approach the apartment "merely to ask [Smith] questions." *Lundin*, 817 F.3d at 1160. They entered the curtilage to arrest him, which was outside the scope of any implied license that they had been given to get on the porch. When officers enter a home or its curtilage with the purpose of arresting someone, and there are no exigent circumstances, they need a warrant. It makes no difference that the officer might also want to do something else, such as talk to the arrestee. If officers could enter a home to make an arrest without exigent

---

[4] I agree with Magistrate Judge Ferenbach that the early hour made it unreasonable for the officers to believe they had permission to enter Smith's porch. ECF No. 37 at 8-9. Even though Smith was on his porch, most people do not generally accept unexpected visitors at 5:00 a.m.

circumstances so long as they also had another reason handy, the warrant requirement would be eviscerated.

### B. Whether the officers could arrest Smith under *United States v. Santana*

The government next argues that even if the officers had no right to be on Smith's porch, there were permitted to arrest him under *United States v. Santana*, 427 U.S. 38 (1976). The government takes this case to hold that individuals do not enjoy any Fourth Amendment protections against warrantless arrests when they are standing on their porch exposed to the public's view. ECF No. 32 at 5 (citing *Santana* and *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).

In *Santana,* officers had probable cause to arrest Santana for selling heroin, so they drove to her home even though they did not have an arrest or search warrant. *Id.* at 39-41. When they arrived, the officers spotted Santana standing in the doorway of her house. *Id.* at 40. She turned, fled, and the officers chased her inside to make the arrest. *Id.* at 40-41.

The Supreme Court held that the officers were permitted to arrest Santana while she stood in the doorway of her home. Although the Court held that there were exigent circumstances warranting their chase inside, the Court expressly stated that while Santana stood in her doorway officers could arrest her without a warrant. *Id.* at 42. Relying on *Katz v. United States*, 389 U.S. 347, 351 (1967), the Court reasoned that by exposing herself to the public, Santana no longer had any "expectation of privacy," and therefore she no longer had any Fourth Amendment protections against a warrantless arrest. *Id.*

At first blush, *Santana* appears to hold that officers may arrest anyone at the doorway of their home as long as they are in the public view (and therefore no longer have any expectation of privacy). But *Santana* does not control here because the Court did not address the species of Fourth Amendment violation that Smith raises here. First, Santana never raised, and the Court never addressed, whether the officers improperly entered the curtilage of Santana's home. Indeed, the Supreme Court would not clarify the Fourth Amendment rights related to the curtilage until many years later in *Oliver v. United States*, 466 U.S. 170, 180 (1984). *Santana's* holding is

therefore confined to arrests made at the threshold of a house; it did not address when an officer may walk into the curtilage of a home, as Officer Kim did.

Second, *Santana* addressed only the right to be free from intrusions based on a reasonable expectation of privacy, not the right that Smith raises: the right to be free from improper trespasses into constitutionally protected areas. The caselaw notes a difference between protection of privacy and protection from trespass. As early as 1980, the Supreme Court signaled that in addition to rights related to privacy, citizens enjoy a Fourth Amendment right to be free from physical trespasses in their home. *Payton v. New York*. 445 U.S. at 586–87 (noting that the Fourth Amendment prohibits "a warrantless seizure" in a "private premises"). But it wasn't until just a few years ago that the Supreme Court explicitly clarified what this meant.

In *U.S. v. Jones,* the Supreme Court explained that the right to be free from privacy intrusions addressed in *Katz* is an additional right, "not [a] substitut[ion] for, the common-law trespassory" rights protected by the Fourth Amendment. *Jones*, 565 U.S. at 409. In other words, citizens have a Fourth Amendment right not only to their expectations of privacy, but also to exclude others from their home and its curtilage whether or not they have an expectation of privacy in that area. In *Jones,* the government argued that its tracking of the defendant with a GPS device did not violate his expectation of privacy and thus did not trigger the Fourth Amendment. *Id.* at 406. The Court held that it "need not address" the privacy argument because the officers trespassed into the defendant's constitutionally protected area without permission to place the device. *Id.* In *Jardines,* the Supreme Court similarly held that officers violated the Fourth Amendment by trespassing into the defendant's curtilage with an improper purpose to search—it did not require that the defendant's expectation of privacy be violated. *Jardines*, 133 S. Ct. at 1417 ("[W]e need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz*.").

Before *Jones* and *Jardines*, the Ninth, Eighth, and Second Circuits consistently relied on *Santana* to hold that officers may arrest defendants in their doorway with impunity. *See, e.g., United States v. Crapser,* 472 F.3d 1141, 1149 (9th Cir. 2007); *United States v. Gori*, 230 F.3d

44, 54 (2d Cir. 2000); *United States v. Peters*, 912 F.2d 208, 210 (8th Cir. 1990). But many other courts at the time rejected this reading of *Santana*. For example, Judge Posner explained in *Hadley v. Williams*, 368 F.3d 747 (7th Cir. 2004) that "the effect of the rule of [the Second and Ninth Circuits] is to undermine, for no good reason that we can see, the principle that a warrant is required for entry into the home, in the absence of consent or compelling circumstances. Those cases equate knowledge (what the officer obtains from the plain view) with a right to enter, and by so doing permit the rule of *Payton* to be evaded." *Id.* at 750.

In the wake of *Jones* and *Jardines*, the Ninth Circuit confirmed in *United States v. Perea-Rey*, 680 F.3d 1179 (9th Cir. 2012), that the right to be free from warrantless trespasses is in addition to the right of privacy addressed in *Santana*. The Ninth Circuit explained that "although a warrant is not required to observe readily visible items within the curtilage . . . a warrant is required to enter the home." *Id.* at 1186. The court explained that whether or not officers can "observe part of the curtilage" has no bearing on whether officers may, without a warrant, "enter those areas to conduct . . . seizures." *Id.* Although neither the Supreme Court nor the Ninth Circuit has expressly overruled *Santana*, I am unpersuaded that it applies here.[5]

---

[5] Although not raised by the parties, it is notable that most of the relevant recent Supreme Court caselaw addresses searches, not seizures (such as arrests). One could argue that this caselaw clarifying rights related to a home's curtilage and physical trespasses therefore applies only to searches and not to arrests. Indeed, in *Lundin*, the Ninth Circuit indicated that it has not yet addressed whether "voluntarily expos[ing]" oneself to the public still allows officers to conduct a warrantless arrest in the doorway of a home in light of *Jardines*. *Lundin*, 817 F.3d at 1160. But the Supreme Court has left little doubt that its recent search cases also apply to arrests. The Court has never indicated that its interpretations of the Fourth Amendment in these cases apply only to the "search" portion of the Fourth Amendment, but not the "seizure" part. In fact, the Supreme Court explained in *Payton* that both searches and arrests are treated the same for purposes of warrantless entries: "any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. . . . [The Fourth Amendment uses] terms that apply equally to seizures of property and to seizures of persons." *Payton*, 445 U.S. at 590. And the Ninth Circuit appears to have also held that these recent cases apply to seizures. In *Perea-Rey*, for example, after explaining that officers can violate the Fourth Amendment by trespassing on protected curtilage regardless of whether the owner has an expectation of privacy in that area, the Ninth Circuit held that by entering the curtilage of a home without a warrant, "seizure by the agents violated [the] Fourth Amendment." *Id.*

## C. Whether the inevitable discovery exception applies

Finally, the Government argues that the gun should not be suppressed because it would have inevitably been discovered when Smith was arrested. The Ninth Circuit rejected such an argument under similar circumstances in *Lundin*:

> We do not apply the inevitable discovery doctrine to warrantless searches where probable cause existed and a warrant could therefore have been obtained because "[i]f evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant." . . . Thus, "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." . . . Put differently, allowing the government to claim admissibility under the inevitable discovery doctrine when officers have probable cause to obtain a warrant but fail to do so would encourage officers never to bother to obtain a warrant.

817 F.3d at 1161-62 (citation omitted).

Here, the pat down would not have happened but for Officer Kim's unconstitutional encounter with Smith on his porch. The unconstitutional conduct cannot justify the search or seizure caused by that conduct. *Id.* at 1160 ("[T]he officers violated Lundin's Fourth Amendment right . . . when they stood on his porch and knocked on his front door. And since this unconstitutional conduct caused the allegedly exigent circumstance . . . that circumstance cannot justify the search resulting in the seizure of the two handguns.")

## III.    CONCLUSION

Ultimately, my task is to determine whether the totality of the circumstances justified the officers' actions. *Lundin*, 817 F.3d at 1159. Here, the reasonable step would have been for Officer Kim to request an arrest warrant. She then could have arrested Smith at the apartment and conducted a lawful search. Because she did not obtain a warrant, Smith's Fourth Amendment rights were violated, and the weapon and statements must be suppressed.

IT IS THEREFORE ORDERED that Magistrate Judge Ferenbach's Report & Recommendation **(ECF No. 37) is accepted as modified above**. Smith's motion to suppress **(ECF No. 18) is granted.** The Government's motion for leave to file a reply **(ECF No. 40) is**

1  **granted**. Smith's request for permission to file a sur-reply (contained in ECF No. 41) is denied

2  as moot.

3         Dated: May 9, 2017.

4                                                    _____
                                                     ANDREW P. GORDON
5                                                    UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28